**SO ORDERED.**

**SIGNED this 18th day of September, 2014.**




_____
UNITED STATES BANKRUPTCY JUDGE

---

## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| JASON CLINT WORLEY, | ) | Case No. 13-50180 |
| | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| WANN VAN ROBINSON, MARY D. | ) | |
| ROBINSON, and THE WANN VAN | ) | |
| ROBINSON REVOCABLE TRUST, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Pro. No. 13-06081 |
| | ) | |
| v. | ) | |
| | ) | |
| JASON CLINT WORLEY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER came before the Court for trial on September 4, 2014, after due and

proper notice, upon the Complaint Objecting to Discharge (the "Complaint" or "Objection to

Discharge") filed by Wann Van Robinson, Mary D. Robinson, and the Wann Van Robinson

Revocable Trust (collectively, the "Robinsons"). Appearing before the Court was R. Scott

1

Adams and Rayford K. Adams, counsel for the Robinsons; Jason Jelinek and Phillip Bolton, counsel for Jason Clint Worley (the "Debtor"); and Bruce Magers ("Mr. Magers") as Chapter 7 Trustee. The Debtor also appeared and testified before the Court. Following the trial, and upon consideration of the Complaint, the responses thereto, the arguments of counsel, the live testimony of the Debtor and Mr. Magers, and the deposition testimony of Daniel Crapps and Joshua Crapps, and for the reasons that follow, the Court will grant the Robinsons' Objection to Discharge pursuant to 11 U.S.C. § 727(a)(4) and deny the Debtor's discharge in the bankruptcy case.

## FINDINGS OF FACT

### I.  PRE-PETITION BACKGROUND

*A.  The Debtor's Financial Experience and Employment History*

Beginning in the early 2000s, the Debtor became actively involved in the financial industry. Graduating from the University of Florida in 2001 with a Bachelor's degree in finance, the Debtor obtained employment with Edward Jones in 2002. The Debtor subsequently received his Series 7 and Series 63 licenses, which allowed him to purchase securities and perform financial transactions. Between 2006 and 2007, Edward Jones promoted the Debtor to a limited partner, and the Debtor earned approximately $140,000.00 in 2009. Although the Debtor insisted at trial that he was unable to recall his salary for the years preceding 2009, he later admitted that he first earned in excess of $100,000.00 in 2004, and made over $350,000.00 in 2008. During his employment at Edward Jones from 2002 to 2009, the Debtor earned a total of $1,400,000.00, and received approximately $1,100,000.00 after taxes.

While the Debtor initially deposited all paychecks into his Edward Jones account, he later transferred funds to Amy Worley's trust account on a regular basis. Amy Worley's trust account

2

was established at Bank of America between 2001 and 2002, and was originally funded with her own income. The Debtor's contributions to Amy Worley's trust account were used to cover daily living expenses. The Debtor then either spent or invested the remaining funds in his Edward Jones account. Specifically, the Debtor was enticed by the "heavy investment environment" of the early 2000s and made the following relevant expenditures:

1. The Debtor purchased a house in Florida by putting $15,000.00 down and securing a loan for $305,000.00.

2. The Debtor purchased property at Cinnamon Lake by putting between $10,000.00 and $15,000.00 down and securing two loans for a total of $70,000.00.

3. The Debtor purchased a home in Highlands, North Carolina by putting $10,000.00 down and securing a loan for $325,000.00.

4. The Debtor and two other individuals invested in property located at Dog Island. The Debtor's share of this expense was approximately $60,000.00.

5. The Debtor and two other individuals invested in property located at Alligator Island. The Debtor put $60,000.00 down and was responsible for his 1/3 share of the $720,000.00 loan.

6. The Debtor invested in Gemini Land Trust, LLC ("Gemini"), with Joshua Crapps on January 24, 2006. The Debtor provided the initial funds for Gemini in the amount of $130,000.00, consisting of $65,000.00 for the Debtor's share and a loan from the Debtor to Joshua Crapps in the amount of $65,000.00.

The Debtor's payments on these mortgages and loans totaled approximately $90,000.00 per year. Additionally, the Debtor lost his $240,000.00 investment in the Alligator Island property and incurred $100,000.00 in student loan debt to pursue his Master of Business Administration at Emory University. Moreover, the Debtor established three LLCs during this period, including Gator Pointe, LLC, Dog Island Land Trust, LLC, and Euton Capital International, LLC. However, these LLCs were never funded, and the Debtor could not recall the purpose of these entities. By 2011, all of the Debtor's income from Edward Jones was gone.

3

Following his departure from Edward Jones, the Debtor opened two Roth IRA (E*Trade) accounts, which are currently valued at $102,000.00 and $195,000.00. The Debtor converted his Edward Jones' IRA accounts to Roth IRA accounts in 2010, and paid all applicable taxes on the conversion. These Roth IRA (E*Trade) accounts were funded solely through legal IRA contributions, and the Debtor maxed out his contributions every year since 1997.

After a brief stint at Worley Financial Services, LLC from 2009 to 2011, the Debtor secured employment at LPL Financial ("LPL") in March 2011. LPL paid the Debtor a $75,000.00 signing bonus and offered the Debtor a $75,000.00 loan. The remainder of the Debtor's income at LPL was based solely on commissions. The Debtor soon realized he was losing money at LPL and ended his employment contract. The Debtor was unable to secure full time employment for over a year before filing bankruptcy, and voluntarily relinquished his Series 7 and Series 63 licenses.

B.     *The Debtor's Interest in Gemini*

During the Debtor's energized investment phase at Edward Jones, he and Joshua Crapps established Gemini Trust, LLC for the sole purpose of investing in real estate. The Debtor provided all initial funding for Gemini in the total amount of $130,000.00, consisting of $65,000.00 for the Debtor's share and a loan from the Debtor to Joshua Crapps in the amount of $65,000.00. The Debtor financed Gemini by securing a $60,000.00 loan, and provided the remaining capital from his Edward Jones account. Although the Debtor fronted all capital contributions for Gemini, Joshua Crapps received a 2% interest in Gemini up front, and the Debtor and Joshua Crapps each received 49% of the remaining interest.

Subsequent to its formation, and in order to fulfill its sole purpose, Gemini purchased a 10% ownership interest in Pelham Land Group, LLC ("Pelham"). The Debtor and Joshua Crapps

4

learned of Pelham through Daniel Crapps, an experienced real estate broker.[1] Pelham owned approximately 587 acres of timberland in Mitchell County, Georgia, with an initial estimated sale value of $3,000.00 per acre. By the end of 2006, Pelham listed Gemini's 10% interest as having a total value of $164,484.00 (49% of which represented the Debtor's share). This valuation decreased slightly from 2007 to 2012, with the current valuation figure at $132,128.00. For 2012, the price per acre of the Pelham land had decreased to $2,250.00. The Georgia tax valuation illustrates that the entire Pelham property is divided into two parcels, with a fair market value of $604,000.00 for the larger tract and $107,000.00 for the smaller tract.

In addition to its sale value, the Pelham land produces income through farming, hunting, and timber leases. The farming lease generates approximately $8,000.00 per year of revenue while the hunting lease produces $5,000.00 per year. The income obtained through the timber lease, however, varies significantly with the age and condition of the trees, and is difficult to estimate in advance.

As a result of the Debtor's interest in Gemini, he received annual K1 filings from the firm of Odom, Moses & Co, LLP. The Debtor obtained his first K1 form for the 2007 calendar year (the "2007 K1"), which showed a proportional income loss of $137.00. The 2007 K1 listed the Debtor's interest at 50%, and reflected an ending capital account of $68,502.00 for the Debtor's share. The K1 forms filed for 2008 through 2012 similarly showed ending capital account balances between $68,985.00 and $67,555.00. The account balances fluctuated based on annual ordinary business gains or losses, with the Debtor receiving the highest gain in 2008 of $483.00.

---

[1] Daniel Crapps is Joshua Crapps' father. He possesses a Florida real estate broker's license and has an office licensed in Georgia. Daniel Crapps has performed over one hundred land trust and LLC transactions and has been the manager or co-manager in at least 90% of those deals. Given his experience, Daniel Crapps stated that he "know[s] more than appraisers," and no longer uses appraisals to value land. (Daniel Crapps Dep. 17:18, Aug. 28, 2013.)

All K1 forms listed the Debtor's interest at 50%, despite the Debtor's assertion that his interest was 49%. As of 2012, the total value of Gemini was estimated at $126,705.00.

## II.  THE BANKRUPTCY FILING

The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on February 14, 2013. Anticipating that no funds would be available for distribution to unsecured creditors, the Debtor categorized the bankruptcy filing as a no asset case. However, on March 25, 2013, Mr. Magers filed the Trustee's Notice of Assets & Request for Notice to Creditors (the "Notice of Assets"), implying that assets would be available for distribution.[2] On Schedule A— Real Property, the Debtor listed only one parcel of residential real estate located in Winston-Salem, North Carolina. On Schedule B—Personal Property, the Debtor disclosed the following relevant assets:

> 2. Checking, savings or other financial accounts: Jointly held checking account at SunTrust worth $687.00.

> 12. Interest in IRA, ERISA, Keogh, or other pension or profit sharing plans: Roth IRA (E*Trade) worth $102,000.00 and Roth IRA (E*Trade) worth $195,000.00.

> 14. Interests in partnerships or joint ventures: ¼ interest in Cinnamon Lake Recreation Society with an unknown value, and a 48% interest in Gemini Land Trust, LLC with a value of $2,500.00.

The Debtor exempted a total value of $340,947.00, but did not exempt an interest in Gemini.[3] On the Statement of Financial Affairs, the Debtor indicated "none" to the following pertinent categories: 1. Income from employment or operation of business; 2. Income other than from employment or operation of business; 3. Payments to creditors; 4. Suits and administrative proceedings, execution, garnishments, and attachments; 11. Closed financial accounts; 14.

---

[2] Mr. Magers filed the Notice of Assets after learning that Gemini owned a 10% interest in Pelham, which owned 587 acres of timberland. Mr. Magers felt the Debtor's interest in Gemini exceeded the scheduled petition value and would produce income for distribution to creditors.

[3] If the case had been closed as a no asset case, the Debtor's property interest in Gemini would have been abandoned to the Debtor pursuant to 11 U.S.C. § 554.

6

Property held for another person; 15. Prior address of debtor; and 18. Nature, location and name of business. The Debtor signed his petition under penalty of perjury, signifying that all information provided was accurate and complete.

A.      *The Debtor's Amended Schedules*

On February 20, 2013, the Debtor filed his first amendment to the petition schedules (the "First Amendment"). The Debtor received a copy of his petition in the mail and noticed that legal counsel omitted his interest in Chesapeake Operating, Inc. ("Chesapeake"), which he inherited in 2008 from his grandfather, Charles Bates. The Debtor's interest in Chesapeake generates approximately $20.00 in annual royalties, and pays one time per year based on production. The Debtor revised Schedule B to disclose a $100.00 interest in Chesapeake under number 14. Interests in partnerships or joint ventures. However, the Debtor's classification of his mineral interest in Chesapeake was improper and should have been listed under number 35. Other personal property of any kind not already listed. Following this First Amendment, the Debtor felt his schedules were complete.

The Debtor's second amendment to the petition occurred on May 7, 2013 (the "Second Amendment"), two days before the Debtor's scheduled 2004 examination. On Schedule B, the Debtor added the following items to number 2. Checking, savings or other financial accounts: a jointly held checking account at Chase Bank worth $0.00, and a Checking account at LPL Financial worth $142.00. These accounts were omitted oversights. The Debtor further revised Schedule B to reflect a 49% interest in Gemini Land Trust, LLC, rather than a 48% interest. The value of the Debtor's interest in Gemini, however, remained constant at $2,500.00. Additionally, the Debtor amended his claim for property exemptions to $341,189.00 (an increase of $242.00). The Debtor further altered his Statement of Financial Affairs to provide the following information:

1. Income from employment or operation of business: Joint wages for 2011 in the amount of $46,090.00.

2. Income other than from employment or operation of business: 2011 other income in the amount of $23,195.00 and 2012 other income in the amount of $21,000.00.

3(b). Payments to creditors: Chase in the amount of $3,492.00, John Mandala in the amount of $400.00, SunTrust in the amount of $1,580.00, and Dieter, Stephens, Durham & Cook in the amount of $459.00. The majority of these payments occurred pre-petition in November and December of 2012.

4. Suits and administrative proceedings, executions, garnishments and attachments: Worley v. Edward D. Jones & Co., L.P. et al. (settled in July 2012) and Robinson v. Worley, et al. (judgment in favor of Robinson on December 3, 2012).

11. Closed financial accounts: Bank of America checking account with a balance of $0.00, which closed pre-petition in September 2012.

14. Property held for another person: Amy Verderosa Worley. Debtor states that he is trustee of the Amy Verderosa Worley Revocable Trust, which holds funds in trust for Amy Worley. The assets of the trust are located at Bank of America in the amount of $9,060.57.

15. Prior address of debtor: two prior addresses listed for the Debtor where he resided from 2005 to May 2011, and then May 2011 to June 2012.

18. Nature, location and name of business: Debtor added eight businesses, including Edward D. Jones & Co., L.P., Worley Financial Services, LLC, Gemini Land Trust, Cinnamon Lake Recreation Society, Chesapeake Operating, Inc., Gator Pointe, LLC, Dog Island Land Trust, LLC, and Euton Capital International, LLC.

All of the information provided by the Debtor in the Second Amendment was available pre-petition. The Debtor added number 14. Property held for another person, after being instructed by the Court to disclose his wife's trust account. Additionally, the Debtor had provided the information in number 15. Prior address of debtor, to his counsel, and was unsure why the information had not been included in the original petition. Finally, the Debtor conceded that the impending 2004 examination influenced his decision to submit the Second Amendment "out of an abundance of caution" and "for clarity."

On May 16, 2013, approximately seven days after the 2004 examination, the Debtor filed his third amendment to the petition (the "Third Amendment"). The Third Amendment solely affected the Statement of Financial Affairs. Specifically, the Debtor altered number 2. Income other than from employment or operation of business, to reflect 2011 other income in the amount of $33,195.00 and 2012 other income in the amount of $41,000.00. The figures represented in the Second Amendment were typos, and thus, an additional amendment was necessary to clarify the 2011 and 2012 income values. The Debtor further amended item number 10. Other transfers, to disclose periodic transfers of funds to and from the Jason C. Worley Revocable Trust between June 23, 2004 and July 2012. The funds in this trust were used to cover the Debtor's general living expenses.

In October 2013, the Debtor received correspondence from his aunt informing him that he inherited a 1/3 interest in mineral rights on eight acres in Oklahoma. Although the Debtor became aware of this interest in September 2013, he mistakenly believed the Oklahoma mineral rights interest was identical to his interest in Chesapeake. The Debtor amended his schedules a fourth time on October 25, 2013. This time, the Debtor altered Schedule A to provide a description of the Oklahoma property, and stated the value as "Unknown." Five days later, on October 30, 2013, the Debtor filed his fifth and final amendment, which decreased his interest in the Oklahoma mineral rights property from 1/3 to 1/24. The Debtor further valued his interest in this property at $6,815.44.

B.      *The Debtor's Valuation of Gemini*

The Debtor's original schedules and all subsequent amendments consistently valued the Debtor's interest in Gemini at $2,500.00. To obtain this figure, the Debtor selected the capitalization rate as his method of valuation. Specifically, the Debtor multiplied the highest income distribution he received from Gemini, which was in the amount of $483.00 (rounded to

9

$500.00), by five. The Debtor obtained the $483.00 figure from the 2008 K1, and that he referred to the K1 documents when valuing his interest in Gemini. The Debtor never requested an appraisal of the Pelham property prior to his valuation, and had never visited the property in person. Although the Debtor informed Mr. Magers of the methodology used to calculate his interest in Gemini, he never disclosed his $65,000.00 payment to fund Gemini.

Furthermore, the Debtor did not contact either Joshua Crapps or Daniel Crapps when estimating the value of his interest, despite the fact that Joshua Crapps was the managing member of Gemini and Daniel Crapps was an experienced real estate broker. The Debtor even conceded that Joshua Crapps would be in a better position to value Gemini because of his access to Daniel Crapps. Both Daniel Crapps and Joshua Crapps disagreed with the Debtor's $2,500.00 valuation of his interest in Gemini. Specifically, Daniel Crapps explained that a minority share in an LLC will typically be sold to other members for 20-30% of its value. Given that Pelham listed Gemini's 2012 value at $132,128.00, Gemini's minority share in Pelham could be sold for a minimum of $26,425.60. This makes the Debtor's minority interest in Gemini worth at least $13,212.80. Both Daniel Crapps and Joshua Crapps expressly refuted the notion that Gemini should be valued as low as $2,500.00.[4]

Finally, prior to the trial, Pelham sold its largest tract of land and distributed $100,000.00 to each 10% interest holder, including Gemini. The Debtor is currently in the process of receiving his $50,000.00 share. However, even with the knowledge that his interest in Gemini's proceeds is $50,000.00, the Debtor claimed that he would still list Gemini's value at $2,500.00 on the petition.

---

[4] When asked whether he "would . . . ever value the interest of Gemini as something like $2500 or something that low," Daniel Crapps responded, "In this property? No." (Daniel Crapps Dep. 60:25-61:3, Aug. 28, 2013.) Similarly, although Joshua Crapps admitted that he was unsure of Gemini's actual value, he stated that "it would be more than [$]2500." (Joshua Crapps Dep. 65:7, Aug. 28, 2013.)

## III. THE ADVERSARY PROCEEDING

Following the Debtor's bankruptcy filing, the Robinsons initiated an adversary proceeding against the Debtor on September 30, 2013, objecting to the Debtor's discharge on four grounds. First, the Debtor intentionally undervalued his interest in Gemini Land Trust, LLC by more than 95% and should be denied a discharge pursuant to § 727(a)(4) of the Bankruptcy Code. Second, the Debtor failed to explain his deficiency of assets after having earned $1,400,000.00 at Edward Jones, and neglected to identify the source of exempt funds in his two Roth IRA (E*Trade) accounts, supporting a denial of discharge under § 727(a)(5). Third, the Debtor omitted his ownership interest in Chesapeake from the original petition schedules and misrepresented its value in an attempt to hinder, delay, or defraud the trustee and creditors pursuant to §§ 727(a)(2) and (4). Finally, the Robinsons argue that the five amendments to the Debtor's petition illustrate the Debtor's intent to conceal property from the trustee and creditors, thus warranting denial of a discharge under § 727(a)(2).

## DISCUSSION

A principal goal of the Bankruptcy Code is to provide the debtor a fresh start "unhampered by the pressure and discouragement of preexisting debt." *In re Belk*, 509 B.R. 513, 518 (Bankr. W.D.N.C. 2014). The reward of a fresh start, however, is limited to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Debtors who "play fast and loose with their assets or with the reality of their affairs" may be denied their bankruptcy discharge pursuant to 11 U.S.C. § 727. *In re Belk*, 509 B.R. at 518. While the denial of a discharge is a drastic remedy, it is warranted where debtors have been "less than honest" or unscrupulous. *In re Olbur*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004); *In re McGalliard*, 183 B.R. 726, 732 (Bankr. M.D.N.C. 1995); *see In re Spiers*, Ch. 7 Case No. 11-32345, Adv. No. 1203211, 2013 WL 319785, at *6 (Bankr. W.D.N.C. Jan. 28, 2013).

To prevail on an objection to discharge, a party need only prove one ground for non-dischargeability under § 727(a). *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 250 (4th Cir. 1994) (noting that the provisions of § 727(a) are phrased in the disjunctive). The party objecting to discharge bears the burden of proof by a preponderance of the evidence. *Id.* at 249; *In re McGalliard*, 183 B.R. at 731; *see* Bankr. R. 4005. Although the burden may shift to the debtor to provide satisfactory, explanatory evidence following the creditor's *prima facie* case, the ultimate burden resides with the moving party. *Farouki*, 14 F.3d at 249; *In re Michael*, 452 B.R. 908, 916 (Bankr. M.D.N.C. 2011).

The Robinsons first contend that the Debtor should be denied a discharge pursuant to § 727(a)(4) for purposefully undervaluing his interest in Gemini. For the Court to deny a discharge under this section, the Robinsons must establish that the Debtor (1) made a false statement under oath and (2) that such statement was made willfully and with the intent to defraud. *In re Johnson*, 82 B.R. 801, 805 (Bankr. E.D.N.C. 1988); *see* 11 U.S.C. § 727(a)(4)(A).

The first element requiring a false statement under oath is an easily satisfied question of fact. *In re Belk*, 509 B.R. at 519. For purposes of § 727(a)(4)(A), a debtor's petition, schedules, statement of financial affairs, answers to interrogatories, responses made at a 341 meeting, and in-court testimony all constitute statements under oath. *Id.*; *see In re Abdelaziz*, Ch. 7 Case No. 10-51257, Adv. No. 11-6017, 2012 WL 359756, at *3 (Bankr. M.D.N.C. Feb. 2, 2012). An oath becomes false if it includes any material misrepresentation or omission. *See In re Michael*, 452 B.R. at 919 ("A false oath sufficient to merit a denial of discharge includes a misrepresentation or an omission in the debtor's bankruptcy Schedules or Statement of Financial Affairs.") (internal quotation marks omitted).

In contrast to the false statement, the element of fraudulent intent depends largely upon a subjective evaluation of the debtor's credibility and demeanor. *In re Belk*, 509 B.R. at 520. A court will find the requisite intent to deceive where a debtor's statements are inconsistent or incompatible with his own knowledge and information. *In re Michael*, 452 B.R. at 919; *In re Barnette*, 2002 WL 1544472, at *2. Such statements and misrepresentations must exceed the debtor's honest mistake. *In re Michael*, 452 B.R. at 919; *In re Barnette*, 2002 WL 1544472, at *2. However, a debtor's reckless indifference to the truth is the functional equivalent of fraudulent intent, and weighs in favor of denying the debtor's discharge. *In re Belk*, 509 B.R. at 520; *In re Johnson*, 82 B.R. at 805; *see In re Abdelaziz*, 2012 WL 359756, at *5 (noting that "a reckless indifference for the truth . . . supports a finding of fraudulent intent"). While fraudulent intent may be established by direct evidence, it is customarily proven through circumstantial evidence and "inferences drawn from a course of conduct." *In re Belk*, 509 B.R. at 520 (internal quotation marks omitted); *In re Abdelaziz*, 2012 WL 359756, at *4; *see In re Johnson*, 82 B.R. at 805 ("Because debtors are unlikely to acknowledge a fraudulent intent, the court may infer such intent from circumstantial evidence including a pattern of nondisclosure."). Thus, if the debtor's original schedules contain materially incorrect or inaccurate information, his discharge should be denied. *In re Michael*, 452 B.R. at 919.

In the present case, the Court finds that the Robinsons have met their burden of proof under § 727(a)(4)(A). The Debtor's original petition and five subsequent amendments served as oaths for which the Debtor certified under penalty of perjury that all information contained in the schedules was accurate and complete. In these schedules, the Debtor claimed that the value of his interest in Gemini was only $2,500.00 despite the fact that he originally contributed $65,000.00

to fund Gemini. Although the Debtor described his capitalization rate valuation methodology to Mr. Magers, he never disclosed his $65,000.00 capital contribution.

Furthermore, the Debtor received annual K1 filings since 2007 that valued his interest in Gemini between $68,985.00 and $67,555.00. The Debtor did not divulge these figures to Mr. Magers, and made no attempt to contact either Daniel Crapps or Joshua Crapps during the valuation process. The Debtor's failure to converse with the managing agent of Gemini and the experienced realtor who informed the Debtor of the Pelham investment opportunity illustrates a reckless indifference to the true value of Gemini.[5] This conclusion is strengthened by the Debtor's own admission that Joshua Crapps and Daniel Crapps were in a superior position to value Gemini. Neither Joshua Crapps nor Daniel Crapps would value the Debtor's interest in Gemini as low as $2,500.00, even when discounted to 20-30% of its original value. The fact that Mr. Magers engaged in his own valuation of Gemini and subsequently notified the Court that assets *would* be available for distribution further supports denying the Debtor his discharge.

Additionally, the sale of Pelham's largest tract of land occurred immediately preceding the trial. The sale generated $100,000.00 for Gemini, with the Debtor receiving a $50,000.00 share. However, despite having contributed $65,000.00 to fund Gemini and obtaining $50,000.00 from the sale of Pelham's property, the Debtor testified at trial that he would still value his interest in Gemini at $2,500.00 today. The Court finds this testimony suspect and believes it is improbable that the Debtor would still value his interest as low as $2,500.00.

Moreover, while the Court agrees with Debtor's counsel that the value of an LLC is not equivalent to the sale price of the underlying real property, the Court finds that the Debtor's

---

[5] The Court notes that the Debtor has known Joshua Crapps since high school and has interacted with Daniel Crapps on numerous occasions throughout his childhood. Both Joshua Crapps and Daniel Crapps attended the Debtor's wedding. The Debtor's personal relationship with both parties creates further speculation as to why the Debtor refused to request their assistance in valuing his interest in Gemini.

14

valuation of Gemini is so low as to be unrealistic. *In re Soderstrom*, 484 B.R. 874, 880 n.5 (M.D. Fla. 2013) (stating that the interest an LLC member owns is "wholly different than an undivided interest in property that co-owners own in a tenancy in common or joint tenancy"). The Debtor impermissibly disregarded his initial capital contribution to Gemini, and also devalued the timber, hunting, and farming profits of the Pelham property. *See generally In re Warner*, 480 B.R. 641, 653 (Bankr. N.D. W. Va. 2012) (explaining that the rights of an LLC member "may be broader than merely sharing in distributions from a LLC"). Given the Debtor's extensive background in finance and his experience interpreting financial documents, the Court concludes that the $2,500.00 value of Gemini was a material misrepresentation and inconsistent with the Debtor's knowledge. Therefore, the Debtor's discharge is denied pursuant to § 727(a)(4).

Provided the disjunctive phrasing of § 727, the Court need not address the Robinsons' remaining three arguments. Nonetheless, the Court notes that the Robinsons have only carried their burden of proof with respect to the Debtor's valuation of Gemini, and have failed to prove any further ground for denial of a discharge. Specifically, the Court finds that the Debtor has adequately explained the deficiency of the $1,400,000.00 earned at Edward Jones, given his six investments with loan payments of over $90,000.00 per year. The Debtor also incurred $100,000.00 of student loan debt, lost a $240,000.00 investment with Wann Van Robinson, and expended $50,000.00 in legal fees for litigation against the Robinsons. Moreover, the Debtor traced the source of funds in his two Roth IRA (E*Trade) accounts to his IRA account at Edward Jones, and has maximized his IRA contributions for over seventeen years. For these reasons, the Robinsons have failed to satisfy their burden of proof under § 727(a)(5).

Finally, the Court concludes that the Debtor's omission of his interest in Chesapeake and the five amendments to his petition were not undertaken with the intent to hinder, delay, or

defraud creditors or with the intent to conceal property. Rather, the schedule amendments primarily corrected accidental oversights by Debtor's counsel. The Robinsons have not adequately overcome the Debtor's assertion of honest mistake and have failed to carry their burden of proof with respect to the Debtor's intent.

## **CONCLUSION**

Based on the foregoing, it is therefore ORDERED that the Robinsons' Objection to Discharge is granted pursuant to 11 U.S.C. § 727(a)(4) and the Debtor is denied his discharge in the bankruptcy case.

## **END OF DOCUMENT**

SERVICE LIST

Rayford K. Adams, III
R. Scott Adams
Attorneys for Plaintiff

Jason C. Worley
5136 Laurel View Drive
Winston-Salem, NC 27104

Jason Jelinek
Attorney for Defendant

Bruce Magers
Trustee

William Miller
US Bankruptcy Administrator